1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD VELOZ,                                    No. C 12-06309 WHA

          Plaintiff,

   v.

PACIFIC GAS & ELECTRIC COMPANY          **OMNIBUS ORDER**
and IBEW LOCAL 1245,                                    **DISMISSING ALL CLAIMS ON**
                                                                      **SUMMARY JUDGMENT**
          Defendants.
_____/

**INTRODUCTION**

     In this race-discrimination employment action, there are four pending motions for summary judgment. For the reasons stated herein, all claims are **DISMISSED**.

**STATEMENT**

     The essence of this order is this: plaintiff was fired by his employer for excessive absenteeism. The joint union-employer fact-finding committee found that the termination was "appropriate and for just cause." Now, in this action, plaintiff is suing both the union and the employer. This order finds that no reasonable jury could find liability based on the summary-judgment record. Although this order will lay out the remarkable number of inconsistencies in stories told, even under oath, by plaintiff Richard Veloz, this order makes clear that summary judgment is warranted because of a failure to present admissible evidence that he performed his job duties adequately during the relevant time period and/or that similarly-situated non-Hispanic employees were treated differently. Dismissal is warranted for these reasons, not for reasons of credibility.

1   Plaintiff Richard Veloz identifies himself as Mexican-American or Hispanic.  He is a

2   single father, caring part-time for his son with a congenital heart issue.  Mr. Veloz is a former

3   employee of defendant Pacific Gas & Electric Company (PG&E) and a union member of

4   defendant International Brotherhood of Electrical Workers (IBEW) Local 1245.

5   **1.   PRIOR WORK HISTORY WITH PG&E.**

6   From 2001 to 2006, Mr. Veloz was a material handler and lineman installing and

7   maintaining utility lines for PG&E.  He conducted "maintenance, lines, any kind of work

8   involving electricity" (Veloz Dep. at 106).  In 2006, Mr. Veloz was fired after progressive

9   discipline (including a decision-making leave) based on his alleged involvement in two vehicle

10  accidents and an electrical outage.  In March 2008, a settlement between PG&E and the union

11  reinstated Mr. Veloz as a lineman.  A condition to the settlement was that Mr. Veloz was "placed

12  on a [decision-making leave] active from the date of his return to work [March 2008] for a period

13  of . . . approximately nine months" (Kirk Decl. ¶ 2, Exh. A).  All of this is background for the

14  new employment period that culminated in a termination in 2012.

15  **2.   PG&E POLICIES.**

16  At all material times, PG&E's attendance policy stated (Veloz Dep. at 104, Exh. 7):

17  Sick Leave:  Excessive use or suspected abuse of sick leave may
    result in positive discipline.  An employee absent on Sick Leave for
18  three or more consecutive days may need to provide proof of illness
    upon return to work.

19

20                          *                    *                    *

21  Requesting Sick Leave:  Each time an employee calls in sick s/he
    must speak with his/her direct Supervisor no later than 1/2 hour
    prior to the employee's regularly scheduled start time . . . .
22  Employee must call in each day they are sick, unless prior
    arrangements have been made with their supervisor.

23  Mr. Veloz signed this policy in January 2010.

24  The collective-bargaining agreement stated:  "Company may require satisfactory evidence

25  of an employee's illness or disability before sick leave will be granted."  The funeral policy was

26  (Bradley Decl. Exh. A at DEF 002947, DEF 002970) (emphasis added):

27

28

**United States District Court**
For the Northern District of California

> If at all possible, a regular employee will be granted the actual time off with pay necessary *to attend the funeral* of a member of the immediate family, including the time the body may lie in state and the day of the funeral, and the time necessary to travel to and from the location of the funeral, but not to exceed three workdays.

Since Mr. Veloz was a union member, he was subject to the "positive discipline" guidelines. Generally, the first step in the discipline process was an oral reminder during which the supervisor raised the performance problem and discussed solutions. The second step was a written reminder (WR). The written reminder documented the offense, emphasized a need for change, and warned of further discipline. The last step was a decision-making leave (DML). The supervisor had a discussion with the employee, who was then given a paid-day to consider whether he (or she) wished to continue the employment. If the employee decided to continue working, the supervisor issued a warning that *any* further discipline during the next twelve months could result in termination (Bradley Decl. ¶ 3, Exh. B).

**3.    EVENTS LEADING TO TERMINATION IN APRIL 2012.**

Pursuant to the March 2008 settlement, Mr. Veloz was reinstated but still on decision-making leave. While on such leave, he failed to show up at work on June 18, 2008. This offense could have resulted in his termination. He was not terminated (Kirk Decl. ¶ 3, Bradley Decl. ¶ 3).

**A.    Emergency Mandatory Weekend Assignment in February 2011.**

In February 2011, Lee Kirk, Mr. Veloz's supervisor, informed the team that a large storm was anticipated, necessitating an emergency, mandatory weekend assignment on February 26 and 27. Mr. Veloz asked to be excused, but the request was denied. Mr. Veloz then submitted a request for a vacation day on the following Monday (February 28), which was denied. On February 24, Mr. Kirk met with Mr. Veloz to "reiterate the weekend overtime assignment was mandatory" (Veloz Dep. at 126–27, Kirk Decl. ¶ 5). Mr. Veloz then wrote an email to human resources, dated February 25, 2011 (Veloz Dep. Exh. 8) (emphasis added):

> My name is Richard Veloz[.] I am an Apprentice Lineman out of Edenvale Service Center in San Jose and I was trying to get a hold of someone to help me with my situation prior to the weekend. The supervisor here, Lee Kirk, is forcing all hands to come in this weekend for the storm and I told him ahead of time I would not be able to come in due to my son being ill and having an irregular heart beat and *he has an appointment with a cardiologist on Saturday* and

3

United States District Court
For the Northern District of California

being a single father I have no one to take care of my son on the weekend.  He insisted on me coming in and denied my vacation . . . . My supervisor told me, in front of another supervisor Mike Huckins and also a shop steward who was of no help and just agreed with the Lee Kirk's response, yesterday that if I do not come in to work this weekend that I would be placed on a [decision-making leave] and or Terminated . . . . I feel like I'm being threatened if I don't come in and I told my supervisor that my family comes first.

Without permission, Mr. Veloz skipped the mandatory weekend overtime assignment.

Mr. Veloz was first deposed on April 5, 2013.  Fact discovery closed in February 2014.

A March 2014 order permitted a further deposition, which occurred on March 24, 2014.

At the first deposition, Mr. Veloz admitted that he (and his son) never went to the cardiologist's appointment with Dr. Roge on Saturday (Veloz Dep. at 134–36, 179–80):

Q.  Okay.  "And he has an appointment with a cardiologist on Saturday."

A.  Mm-hmm.

Q.  Did he?

A.  He did.

Q.  Who was the cardiologist?

A.  Dr. — Mr.  — Dr. Roge.

Q.  Dr. Roge.  Did he go to an appointment with Dr. Roge that weekend?

A.  That weekend he didn't because he was sick.

Q.  He did not go?

A.  My son was ill that —

Q.  Okay.

A.  — that weekend

*                    *                    *

Q.  Okay.  And so what — and so you didn't take him to the cardiologist?

A.  No, I wasn't able to — to make it that day with the cardiologist.

*                    *                    *

4

United States District Court
For the Northern District of California

1    Q. No doctor ever confirmed to you that he was seriously ill such
     that you needed to be with him that weekend; right?

2    A. No doctor told me that. I determined that myself.

3                    *               *               *

4    Q. You didn't take him to the doctor that weekend, did you?

5    A. I – I had no need to.

6    When PG&E found no evidence of Mr. Veloz making an appointment or having an appointment

7    (after issuing a subpoena to the hospital), a year later, Mr. Veloz testified at his second deposition

8    (March 2014) that he "could not remember" if he had an appointment. He had asked for the time

9    off to "monitor" his son (*id*. at 345, 354).

10        When Mr. Kirk (the supervisor) called Mr. Veloz on Monday, February 28 to ask why he

11   was not at work, Mr. Veloz responded that he was in the emergency room with an old friend from

12   elementary school, Chris Munoz (Kirk Decl. ¶ 5). At the first deposition (April 2013), Mr. Veloz

13   testified that he went to the hospital (Veloz Dep. at 82):

14   Q. Okay. And when did you take him [Mr. Munoz] to the hospital?

15   A. It was a while ago. I don't recollect the date.

16   Q. Do you remember what the purpose for — what — what the
     problem was?

17   

18   A. I had to take him in because he wasn't feeling good.

19   At the deposition a year later in March 2014, Mr. Veloz recanted (Veloz Dep. at 354–56):

20   Q. Okay. Did you ever take Chris Munoz to the hospital?

21   A. I don't — I don't recall. I'm not sure.

22                   *               *               *

23   Q. When was the last time you met Chris Munoz . . . .

24   A. I don't recall the last time I came in contact with Chris.

25   Q. Okay. Is he a close friend of yours?

26   A. He was friend back in elementary, but I've lost touch with him.

27   Q. Have you seen him since elementary?

28   A. I don't recall, no.

5

United States District Court
For the Northern District of California

1    Following his no-show in February 2011, PG&E issued two written reminders:  (1)

2    insubordination for failure to report to the mandatory overtime assignment and (2) incidences of

3    "no call, no show" because Mr. Veloz did not call in each day regarding his absences (Kirk Decl.

4    ¶ 6, Exh. C).  Mr. Veloz did not provide medical certification covering his absence for the

5    February weekend (Veloz ¶ 8).  The fact-finding grievance committee found that the written

6    reminders had been justified (Veloz Dep. Exhs. 16, 17, Bradley Decl. ¶ 13, Exh. G).

7                    **B.      March 2011 Absences.**

8    The next month at PG&E, Mr. Veloz failed to attend work for more than two weeks

9    without permission and failed to even call in his absences on March 16 and 17 (Bradley Decl. ¶ 6,

10   Exh. C).

11   Mr. Veloz then took March 28 and 29 off to "attend his uncle's funeral."

12   At the first deposition (April 2013), Mr. Veloz testified that he actually went to the funeral (Veloz

13   Dep. at 206, 207):

14          Q.  And it says here you took some funeral leave; right?

15          A.  Yes.

16          Q.  What was the nature of the documentation that you brought
            back showing that you were on the funeral leave?
17
            A.  I brought a keepsake that was given out at the funeral.
18
            Q.  What was the keepsake?
19
            A.  It was a little small box with my uncle's name on it.
20
            Q.  Okay.  Where was the funeral?
21
            A.  It was in Arizona.
22
            Q.  How did you get there?
23
            A.  I drove there.
24
                        *               *               *
25
            Q.  Okay.  So you're telling me that if I subpoena the records from
26          MasterCard at Wells Fargo with your name on it, there should be
            credit-card receipts showing that you paid for a trip to Arizona?
27
            A.  If it's at — if that's — yeah.
28

6

1    Q.  That's a yes?

2    A.  Yes.

3    Q.  Where did you stay in Arizona?

4    A.  In Phoenix.

5    Q.  Where?

6    A.  At a uncle — at my uncle's house.

7  A year later, at the second deposition (March 2014), Mr. Veloz recanted (*id.* at 375):

8    Q.  But he passed in Phoenix, Arizona.  And what you — but you
         never went to the funeral, correct?

9
     A.  I never went to the funeral only because I had to stay with my
10        son.  I couldn't afford to — to go.

11  In a verified interrogatory response, Mr. Veloz admitted:  "Plaintiff did not attend a funeral on or

12  about March 25, 2011 through March 29, 2011" (Davidson Decl. Exh. C).  In a request for

13  admission response, Mr. Veloz admitted that he "has no proof that he attended his uncle's funeral

14  on or about March 25, 2011 through March 29, 2011" (Marston Decl. Exh. F).

15       Even though Mr. Veloz was eventually and generously granted two weeks medical leave

16  for "migraine headaches," that leave did not cover his failure to call in his absences or "funeral

17  leave" days (Wells Decl. ¶ 4).

18                      **C.    April 2011 Decision-Making Leave.**

19       Following the "funeral" absence without leave, Mr. Veloz was placed on decision-making

20  leave for the second time.  The reasons were excessive absenteeism, failure to follow call-in

21  procedure, and failure to provide adequate proof of sick leave and funeral leave.  According to

22  PG&E policy, Mr. Veloz's excessive absences in March 2011 would have been an independent

23  basis for issuing the decision-making leave, since he already had two prior written reminders.

24  The failure to call in was another reason for the decision-making leave.  Mr. Kirk gave Mr. Veloz

25  a decision-making leave letter, dated April 20, 2011.  The letter stated (Kirk Decl. ¶ 7, Exh. D):

26       Effective immediately, you will be required to provide satisfactory
         evidence of illness immediately upon your return to work before
27       your time off due to illness will be authorized . . . . You should
         continue to furnish satisfactory proof of illness immediately upon
28       returning to work from each sick leave absence.

7

> As a result of your actions, you were placed on Decision Making Leave, the final level of Positive Discipline.  You were given the next day to decide whether you wanted to continue your employment with this Company.

> When you returned from your Decision Making Leave on 4/20/11, you informed me that you wanted to continue to work for PG&E and would commit to all our rules.

Despite his promises, Mr. Veloz continued a habit of taking long-weekends, extended holidays, and absenteeism.  Specifically, he called in sick July 1 through July 5, 2011, after his tardy request to take July 5 and 6 off was denied (Bradley Decl. ¶ 7).  He took August 4, 5, and 26 off "without permission, without pay," because he had already exhausted his sick leave (*id*. ¶ 8).  He used sick and sick-relative leave for the Martin Luther King, Jr. weekend.  He then failed to call in and provide doctor's notes for January 30 through February 1 (*id*. ¶¶ 9–10).  This violated the terms of the April 2011 decision-making leave.  He then took February 16, 17, and 21 through 24 off for sick, sick-relative, and vacation time.  He then used sick and sick-relative leave for March 6 through 15.  He failed to show up at work on March 16, 2012.  This was an unauthorized absence.

### D.      March 2012 "Flat Tire."

On March 19, 2012, Supervisor Kirk spoke with Mr. Veloz about his absence on March 16 (Kirk Decl. ¶ 12).  Mr. Veloz testified that "Lee Kirk had told me that I'm getting on permission [sic] without pay" and "[h]e believed I had done something wrong" (Veloz Dep. at 242).

At 4:56 p.m. on March 19, 2012, human resources sought authorization to terminate Mr. Veloz (Bradley Decl. Exh. E).

At 9:23 p.m. on March 19, 2012, Mr. Veloz called the PG&E Global Compliance hotline.  The call records created by the PG&E reporter included the following statement (Veloz Dep. Exh. 19) (emphasis added):

> *On March 16, 2012, Richard called Lee to tell Lee that he was unable to attend work because his vehicle had a flat tire.*  Richard asked Lee if he could use a floating holiday to cover his absence.  Lee denied Richard's request and told him that he need him [sic] to attend work . . . . On March 19, Lee told Richard that he could not use a floating holiday to excuse the absence on March 16.  Lee gave Richard a no-permission-without-pay reprimand.

8

Lee Kirk denied the after-the-fact request for March 16 off and coded it as "without permission, without pay" (Kirk Decl. ¶ 11, Bradley Decl. ¶ 10).  When asked about the flat tire at the deposition on March 24, 2014, Mr. Veloz testified (*id*. at 410–412):

> Q.  Did you in any way whatsoever in March of 2012 indicate that you could not come to work on any day because you have a car problem?
>
> A.  I don't recall if I did or I didn't.  Those dates are kind of blurry in my memory.  It's been a long time.
>
> Q.  You never said anything to the effect of you had a flat tire?
>
> A.  I'm not sure whether I did or not.  I don't recall.
>
>         \*        \*        \*
>
> Q.  So now what kind of car were you driving?
>
> A.  I don't believe I need to give that information.
>
> Q.  Okay.  Where did you take this car with the flat?
>
> A.  I don't believe I could give you that information?
>
> Q.  Why not?
>
> A.  'Cause I just don't think it's pertinent to the case.
>
>         \*        \*        \*
>
> Q.  Okay.  Fine.  Did you have a flat tire that morning, sir?
>
> A.  It's been a long time since that day, I mean, I don't know if I did or not.
>
>         \*        \*        \*
>
> Q.  Did you have a flat?
>
> A.  As I stated before, I do not recall whether I did or I did not.  It's been a long time since that date.

The complaint (filed in December 2012) alleged "the last incident of which was Mr. Kirk's illegitimate denial of Plaintiff's request for a floater holiday when Plaintiff called in, unable to go to work that day" (Compl. ¶ 37).

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

### E.   April 2012 Termination.

Mr. Veloz was terminated on April 5, 2012.  His April 2011 decision-making leave was still in effect.  The termination letter informed him that his attendance was "unsatisfactory" and the termination was due to his "continued unavailability" and "unauthorized absence" (Kirk Decl. ¶¶ 8–12, Exh. E).  When the termination was grieved, the joint union-employer fact-finding committee "agreed that the termination was appropriate and for just cause."  Mr. Veloz "excessively utilize[d] his sick leave" and his attendance "failed to meet expectations" (Bradley Decl. Exh. G).  At oral argument, counsel for PG&E argued that during the last few months of Mr. Veloz's tenure at PG&E, he was absent 55% of the time.

*              *              *

On December 12, 2012, represented by counsel, Mr. Veloz commenced this action alleging eight claims for relief.  Against PG&E, Mr. Veloz alleged race discrimination, retaliation, harassment, and wrongful termination.  The race discrimination claims were alleged under Title VII of the Civil Rights Act of 1964, Section 1981 of Title 42 of the United States Code, and the Fair Employment and Housing Act (FEHA).  Against the union, he alleged race discrimination and duty of fair representation.  The case management order set a May 19, 2014, jury trial date (Dkt. No. 18).  This order follows briefing and oral argument.  On May 2, the Court *sua sponte* provided plaintiff a supplemental briefing opportunity because he appeared to be raising a new claim (undisclosed in his complaint) on the eve of trial.  Counsel for Mr. Veloz filed a sur-reply and 126 pages of exhibits.

### ANALYSIS

#### 1.   PG&E's Request for Judicial Notice.

PG&E requests judicial notice of Mr. Veloz's charge of discrimination to the California Department of Fair Employment and Housing, filed May 21, 2012, and Mr. Veloz's right-to-sue letter, dated May 24, 2012 (Dkt. Nos. 59-1, 61).  This is unopposed.  The request is **Granted**.

United States District Court

For the Northern District of California

2.    **PG&E'S MOTION FOR SUMMARY JUDGMENT.**

A.    **Racial Harassment Under Title VII, Section 1981, and FEHA.**

Mr. Veloz's racial harassment claims are **DISMISSED**.  No reasonable jury could find admissible evidence of racially-derogatory comments directed at Mr. Veloz.  During deposition, Mr. Veloz testified (Veloz Dep. at 92–93, 98–99):

> Q.  So, now, did anyone at PG&E ever call you any racially derogatory names?
>
> A. No.
>
> Q.  Did anyone with the union ever call you any racially derogatory names?
>
> A. No.
>
> Q.  You ever hear anyone at PG&E use any racial or derogatory language?
>
> A. No.
>
> Q.  You ever hear anyone at the union use any racial or derogatory language?
>
> A.  No.
>
> Q.  Okay.  You ever seen anybody at PG&E use any depictions, photographs, videos, jokes, anything like that —
>
> A. No.
>
> Q. — racially offensive?
>
> A. No.
>
> Q.  How about the union?
>
> A. No.
>
> Q.  Okay.  Now, Mr. Kirk — okay?  — you ever hear him use any racial or derogatory language?
>
> A. No.
>
> *                    *                    *
>
> Q.  Do you have any reason to believe that Lee Kirk has a bias against people because they're Mexican-American?
>
> A. No.

11

**United States District Court**
For the Northern District of California

1

2
> Q.  Okay.  Do you have any reason to believe that anybody at the union who was involved in your grievance has a bias against people because they're Mexican-American.

3
> A.  No.

4

5
> Q.  Okay.  And so I — I — and I heard you.  I think what you're telling me is that you think that he may have — that Mr. Lee may have had some issues with you because of your prior employment under Mr. Herbner; right?

6
> A.  Yes.  And also for calling in on Lee Kirk.

7
> Q.  And calling in on Lee Kirk.

8
> A.  Yes.

9

10
> Q.  Okay.  But you — but I don't think you're telling me that those were racially motivated.

11
> A.  No, they're not racially motivated.

12  The union shop steward testified:  "Q.  Do you ever hear the guys making any racial jokes down

13  there?  A.  No.  Q.  Any racist comments?  A.  No" (Moore Dep. at 72–73).  The only allegedly

14  "harassing" actions — the discipline and termination — were personnel management actions

15  taken in response to Mr. Veloz's chronic absenteeism.

16       Mr. Veloz concedes all this and provides no opposition to dismissal of the racial

17  harassment claim.  Indeed, the word "harass" only appears in the context of Mr. Veloz's hearsay

18  comments to PG&E's Global Compliance hotline.  Mr. Veloz made at least two calls to the

19  hotline, once in July 2011 and another time in March 2012 (right before he was fired).  The first

20  time Mr. Veloz accused PG&E of racial harassment was 9:23 p.m. on March 19, 2012.  Mr. Veloz

21  testified (Veloz Dep. at 266):

22

23
> Q.  Okay.  Now, prior to you doing this here, had you ever accused him of racial bias before?

24
> A.  No, I haven't.

25
> Q.  Okay.  So, now, let's keep going down through this.  Prior to you doing that, had you accused anybody else at PG&E of racial bias before?

26
> A.  No.

27

28

12

United States District Court
For the Northern District of California

Q. And this was the March 19 complaint that you filed on the ethics hotline. You understood that; right?

A. That — I'm sorry.

Q. Prior to March 19, you had not accused Lee Kirk of racial bias?

A. Right.

The call records created by the PG&E reporter, dated March 19, 2012, stated (Veloz Dep. Exh. 19) (emphasis added):

> On a monthly basis since 2008 (exact month unknown), Lee Kirk has harassed Richard Veloz. Lee asks Richard to provide a doctor's note for himself and for his son when Rich does not attend work when he or his son is ill. Richard said Lee supervises the Richard [sic] the electric distribution department, which contains 95-percent Caucasian employees. *Richard is Hispanic, and he said he and an African-American employee, Norrell Patterson, are the only minorities under Lee's supervisor. Richard said Lee harasses him and does not treat him with respect because he is Hispanic. Richard said Lee does not use discriminatory remarks regarding his race. Richard said Lee does not harass the Caucasian employees or asks them [sic] to submit doctor's notes for their absences.* Richard did not know if Lee harasses Norell.

>                    *                    *                    *

> On March 19, Lee told Richard that he could not use a floating holiday to excuse the absence on March 16. Lee gave Richard a no-permission-without-pay reprimand, which is a when an employee [sic] does not receive permission to be absent from work and does not receive compensation for that absence. Richard did not respond to Lee. *Richard said he fears that Lee will use the absence he had on March 16 as an excuse to terminate him.*

> *Richard said Lee harasses him as a form of racial discrimination.*

Four hours prior to this call, human resources had already sought authorization to terminate Mr. Veloz. When asked to corroborate the hearsay statements in the call records, Mr. Veloz testified "I don't remember the whole conversation" and "I'm not sure exactly what I told her" (Veloz Dep. at 248). Other than these unsworn hearsay statements in PG&E's call records made on the eve of Mr. Veloz's termination, the record is devoid of any evidence supporting any allegation of racial harassment. In his deposition, as stated, Mr. Veloz conceded away any claim of racial harassment. The claims for racial harassment are **DISMISSED**.

13

**United States District Court**
For the Northern District of California

### B.     Retaliation Under Title VII and FEHA.

Mr. Veloz's retaliation claims are also **DISMISSED**.  The retaliation claim is dismissed because Mr. Veloz has failed to offer evidence that he was retaliated against based on race. Our court of appeals has stated:

> To establish a prima facie case of retaliation, a plaintiff must demonstrate:  (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action.

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006).  If a plaintiff has established a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  If the defendant articulates such a reason, the plaintiff may defeat summary judgment by offering direct or circumstantial evidence that a discriminatory reason more likely motivated the employer to take the adverse employment action or that the employer's proffered explanation is unworthy of credence and a pretext for discrimination.  *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1106 (9th Cir. 2008).

Mr. Veloz proffers two incidences of protected activity:  (1) two complaints to PG&E's Global Compliance hotline and (2) his requests for leave under the Family and Medical Leave Act (FMLA).  His FMLA-leave argument is that PG&E was prohibited from retaliating and firing Mr. Veloz for requesting FMLA leave.  Mr. Veloz sought leave for his migraine headaches and his son's heart condition.  As explained below, neither theory survives summary judgment.

\*                          \*                          \*

This order must disregard Mr. Veloz's FMLA-leave argument because it was never properly pled.  Mr. Veloz sprung the FMLA-leave argument on PG&E in its opposition brief, filed less than a month before trial.  This was sandbagging.

Race was and remains what was pled in the complaint (Compl. ¶ 59).  *The FMLA, California Family Rights Act (CFRA), and Americans with Disabilities Act (ADA) were never referenced in the complaint*.  In his sur-reply, Mr. Veloz admitted that (1) "the Complaint does not specifically allege that Plaintiff was denied FMLA/CFRA leave or that Plaintiff was discouraged from taking FMLA/CFRA leave," (2) the complaint "do[es] not allege that PG&E

14

United States District Court

For the Northern District of California

1    utilized his FMLA leave as a negative factor in his termination, (3) and the complaint "made no

2    mention of FMLA" (Sur-reply 7–9).  No notice was provided of any disability-leave claim for

3    relief.  The closest the complaint comes was this (Compl. ¶¶ 25–28, 37):

> 25.   From 2008 to 2012, Plaintiff's young son suffered from a serious chronic heart condition.  As a single father, Plaintiff was required to take days off of work for his son's doctor's appointments and illness and for his own health conditions, including stress-induced migraines caused by PG&E's hostile treatment.
>
> 26.   Plaintiff never exceeded the sick days, vacation days, floating holidays, or any other leave duly granted to him by PG&E, and in each instance followed company policy and practice for notifying PG&E that he needed to take a sick day or other leave.
>
> 27.  However, Mr. Kirk used Plaintiff's time off as a pretext to discriminate against, harass, and retaliate against Plaintiff.
>
> 28.  Mr. Kirk issued Plaintiff multiple disciplines for having to use his sick days.  Mr. Kirk required Plaintiff to provide proof of illness for every sick day Plaintiff took for himself or for his ill son.  Though the requests were unlawful, Plaintiff complied with Mr. Kirk's extra requirements to attempt to avoid further unwarranted discipline and harassment.  Mr. Kirk did not request Plaintiff's non-Hispanic counterparts to provide proof of illness for every sick day they took.
>
> \*                     \*                     \*
>
> 37.  PG&E terminated Plaintiff's employment for the second time on April 5, 2012, for alleged "continued unavailability and unexcused absence," the last incident of which was Mr. Kirk's illegitimate denial of Plaintiff's request for a floater holiday when Plaintiff called in, unable to go to work that day.

20    These allegations in the complaint were not sufficient notice of a FMLA theory.  The complaint

21    never referred to a claim for relief under the FMLA or CFRA.  Nor did Mr. Veloz's initial

22    disclosures reference any requests for FMLA or CFRA leave (Chun Decl. Exh. C) (emphasis

23    added):

> Plaintiff has knowledge of the discrimination and harassment he suffered at PG&E and Mr. Lee Kirk.  Plaintiff has knowledge of his competent performance of his duties, his termination, each protected activities in which he engaged, his son's medical condition, and the pretextual basis for his termination[.] *Plaintiff has information tending to prove that PG&E targeted him because of his protected class: his race [.] Plaintiff has information tending to prove that he has been retaliated against in violation of Title VII.* Plaintiff has suffered loss of earnings, loss of benefits, lost wages, lost earning capacity, hardship, and emotional distress.

15

1    Under documents, his Rule 26 disclosures referred to "medical notes for himself and for his son"

2    but did not refer to any requests for FMLA, CFRA, or disability leave.  The same is true for

3    plaintiff's contentions in the joint case management statement, for which plaintiff wrote

4    (Dkt. No. 17) (emphasis added):

5            Plaintiff's progress towards electrician was thwarted in a *racially*
             *discriminatory fashion*, and after finally becoming an electrician,
6            was disciplined more harshly and more repeatedly than his
             non-Hispanic counterparts.  After Plaintiff[']s employment was
7            terminated based upon a pretextual attendance issue, Plaintiff's
             union, the IBEW grossly mishandled the grievance filed to contest
8            the termination, violating Plaintiff's right to fair representation.

9    Plaintiff never sought to amend his complaint.  The time for amending the complaint has long

10   passed.  The deadline for pleading amendments was April 30, 2013 (Dkt. No. 18).

11           In discovery, Mr. Veloz was asked to "State each and every fact which supports your

12   contention that you were subjected to retaliatory actions and/or conduct as alleged in your

13   Complaint."  He never mentioned disability leave or the FMLA (Davidson Decl. Exh. F):

14           Plaintiff engaged in protected activity on numerous occasions in
             2011 and 2012.  Plaintiff made complaints about Mr. Kirk's
15           harassment and discrimination to PG&E's Compliance and Ethics
             Hotline, Human Resources, Mr. Kirk's supervisor, Laura Selheim,
16           and Employee Assistance Program.  Plaintiff did not receive any
             follow up information from these PG&E resources.  PG&E failed to
17           investigate or address Plaintiff's complaints.  During Plaintiff's
             [local investigating committee] meeting, Mr. Kirk became
18           aggressive towards Plaintiff and acknowledged that he knew that
             Plaintiff had filed a complaint against him.  Following the
19           termination of his employment, Plaintiff grieved his termination and
             followed the company's procedures.  Contrary to the union's
20           findings that Plaintiff did not violate any company procedure, the
             union closed Plaintiff's grievance, making the termination final.

21   (Again, Lee Kirk was Mr. Veloz's supervisor.)  PG&E had no proper notice that this action

22   involved Mr. Veloz's request for FMLA or CFRA leave.  To transmogrify this race-discrimination

23   action into a FMLA-leave action at this late hour would be unfair and prejudicial.  It is now too

24   late to add a FMLA or CFRA claim.

25           Mr. Veloz's failure to provide timely notice of any claim under the FMLA or CFRA

26   renders it unnecessary to reach the further issue of whether any FMLA or CFRA claim is barred

27   due to a failure to exhaust administrative remedies.  In this connection, note well that the

28

16

United States District Court

For the Northern District of California

1  actual charge filed with the Department of Fair Employment and Housing made no reference to a

2  claim under the FMLA or CFRA (Dkt. Nos. 59-2 at 9–10, 61 at 4–5, 122).

3                              *                    *                    *

4           What remains of Mr. Veloz's retaliation claim are his two complaints to the PG&E hotline

5  in July 2011 and March 2012.  A generous review of the facts would reveal that Mr. Veloz has

6  established a tenuous prima facie case of retaliation.

7           In July 2011, Mr. Veloz reported "unfair and harassing" behavior by his supervisor, Lee

8  Kirk.  The call records created by the PG&E reporter, dated July 7, 2011, stated (Veloz Dep.

9  Exh. 18) (emphasis added):

10              *Since 2009 (exact month unknown), Lee Kirk has behaved in an
                unfair and harassing manner towards Richard Veloz . . . .* In March
11              2011 (exact day unknown), Lee required Richard to show proof that
                his family member died after Richard returned from two days of
12              funeral leave.  Richard said employees are allotted three days for
                funeral leave but he did not use all of his.  Richard said Lee did not
13              require any other lineperson to provide proof of their need for
                funeral leave.  *Richard said Lee's behavior lowered his morale*
14              *because Lee treated him unfairly.*

15              At 6:30 p.m. or 6:40 p.m. on July 1, Richard called Lee and told
                him that he would not report to work because he was ill.  Lee asked
16              Richard why his illness occurred and for his symptoms.  Richard
                answered Lee's questions.  Richard sought treatment afterwards and
17              a medical professional advised him not to return to work until
                July 7.  Before 7 a.m. on July 5, Richard told Lee he was still
18              unwell and would not report to work.  Lee questioned Richard again
                and told him to submit a doctor's note for his absences.  Richard
19              said he had a note to give Lee.

20              On July 6, Richard reported to work because his condition
                improved.  Richard gave Lee his doctor's note.  At approximately
21              7:50 a.m., Lee met with Richard and questioned why he did not
                report to work.  Shea Moore witnessed this.  Richard did not
22              understand the treatment because he answered the question before
                and Lee had his doctor's note . . . .  Lee then rudely told Richard to
23              have a nice day.
                *Richard is on a decision-making leave (DML) currently and is*
24              *concerned that Lee will report him to human resources and try to*
                *bring about his termination.  Richard said losing his job would*
25              *create a financial hardship for his family.*

26              *Lee harassed Richard because of his belief that Richard abused his*
                *leave time.*

27
           Mr. Veloz then continued to take sick, sick-relative, and vacation days throughout 2011
28
   and early 2012.  Many of those days were marked as "without permission, without pay."

                                         17

United States District Court
For the Northern District of California

1    Recall also, that Mr. Veloz had previously received his second decision-making leave in

2    April 2011, requiring him to provide "satisfactory proof of illness."

3        In March 2012, Mr. Veloz requested a floating holiday on March 16, after taking almost

4    two weeks off for sick and sick-relative absences (Bradley Decl. ¶ 10, Exhs. C).  Lee Kirk denied

5    the request to take March 16 off.  When Mr. Veloz failed to show up, he was marked as "without

6    permission, without pay" (Kirk Decl. ¶ 11).  This was the last straw.

7        On March 19, Lee Kirk spoke with Mr. Veloz about his absence and consulted with

8    human resources about terminating Mr. Veloz.  Again, Mr. Veloz had been on decision-making

9    leave since April 2011.  At 4:56 p.m., human resources sought authorization to terminate Mr.

10   Veloz for "excessive absenteeism and patterned absences" (Bradley Decl. Exh. E).  That night, at

11   9:23 p.m., Mr. Veloz called the PG&E hotline to report the alleged "racial discrimination."  When

12   asked to corroborate the hearsay call-record statements during deposition, Mr. Veloz testified

13   "I don't remember the whole conversation" and "I'm not sure exactly what I told her"

14   (Veloz Dep. at 248).  A letter dated April 4, 2012, stated Mr. Veloz was terminated for "continued

15   unavailability, unauthorized absence, and unsatisfactory attendance after escalating levels of

16   discipline, including a Decision Making Leave" (Bradley Decl. ¶ 12).  Viewing all reasonable

17   inferences in favor of Mr. Veloz, the July 2011 and March 2012 calls were protected activities

18   preceding the termination effective in April 2012.  This order is thus unpersuaded by PG&E's

19   argument that no prima facie case has been established because Mr. Veloz complained to the

20   hotline *after* the decision to terminate had been made at 4:56 p.m.

21       The burden thus shifts to PG&E to articulate a legitimate nondiscriminatory reason for the

22   termination.  PG&E has met this burden in spades.  Even Mr. Veloz concedes this point (Opp. 13,

23   18).  The decision to terminate Mr. Veloz was based on his "excessive unavailability and

24   patterned absences" (Bradley Decl. Exh. E).  "The decision to terminate Mr. Veloz was based on

25   his continued unavailability to work and nothing else" (Kirk Decl. ¶ 12).  "Plaintiff was

26   terminated for his employment on April 4, 2012 for continued unavailability, unauthorized

27   absence, and unsatisfactory attendance after escalating levels of discipline, including a Decision

28   Making Leave" (Bradley Decl. ¶¶ 11, 12).  "During the time Plaintiff was employed by PG&E,

18

I was not aware of any complaint of unlawful discrimination, harassment, or retaliation made by Plaintiff" (Olivier Decl. ¶¶ 2, 3, Bradley Decl. ¶ 12, Kirk Decl. ¶ 13).  When grieved, the joint union-employer fact-finding committee found "just cause" for the termination.  Indeed, even counsel for Mr. Veloz admits PG&E's burden is met:  PG&E "has done so by referring to his alleged excessive absences, and that is enough to satisfy its burden" (Opp. 13).

        "It thus becomes Mr. Veloz's obligation to show that a jury could find that reason to be a pretext for retaliation" (Opp. 13).  Mr. Veloz has *not* met his burden.  He has failed to identify specific and substantial evidence that PG&E's reason for termination (the retaliation) was a pretext for unlawful race discrimination.  No admissible evidence has been submitted to support a finding that Mr. Veloz was terminated or disciplined based on race.  In opposition, Mr. Veloz argues:

> he perceived Lee Kirk's behavior [as] harassing and unfair and that he was being treated differently than his co-workers (Patten Decl., Exh. "D", Veloz Depo., 99:24–100:16).  Mr. Veloz testified that he was subjected to the ridicule of his co-workers by the excessive call-ups to Kirk's office and the yelling and demeaning conduct by Kirk that was witnessed by his co-workers.  (Patten Decl., Exh. "D", Veloz Depo., 382:7–13).

(Opp. 19–20).  Mr. Veloz's attorney exaggerates the testimony.  On page 382, Mr. Veloz testified (Veloz Dep. at 382) (emphasis added):

> A.  As I stated before, the whole relationship between Lee and I was not an employee to a — to a supervisor relationship.  I was honest with him.  He would use my honesty against me and use it as discipline.  The shop steward saw that.  I mean, everybody's seen that.  *Everybody — every single time I went into Lee's office, all the employees will kind of mock at me.  Seeing me through the glass, seeing me through his office, and it was a very uncomfortable feeling going back and having my head down.  Them asking me questions as far as what did he discipline on you now.*

On page 100, Mr. Veloz testified (*id*. at 100):

> Q.  Because — again, all of that, you're saying, is happening because of the John Herbert [sic] issue?
>
> A.  I don't know if that pertains to it, but I was — I was given the feeling that I was being treated unfairly and differently than my other fellow co-workers at PG&E.

No reasonable jury could find that Mr. Veloz was retaliated against based on race on this summary-judgment record.

1    Mr. Veloz also points to the *two* written reminders he received for missing the emergency

2    mandatory overtime weekend and March 28 work days, as unduly harsh treatment.  He argues

3    that "there is no evidence that Plaintiff's Caucasian counterpart who failed to attend the

4    mandatory overtime received this compound discipline" (Opp. 20).  But the burden at this stage is

5    on plaintiff and his counsel, if this question is to be raised, to show that similarly-situated

6    Caucasians were treated differently.  He has not done so.  Indeed, Mr. Veloz testified:

7    "Q.  Do you know of any other employee who had as many absences as you did?  A.  I don't

8    know everybody's schedule.  I don't know everybody's sick usage . . . . Q.  Do you know of any

9    other employee who had as many writeups as did you for attendance issues?  A.  No, I didn't.

10   That's why I believe I was treated unfairly . . . . Q.  But had any of them taken as many days off

11   as you?  A.  I'm not sure how many people scheduled days off" (Veloz Dep. at 208–09).  It is not

12   enough to raise a mere possibility and say the other side has not disproved it.

13   Accordingly, on the summary-judgment record, no reasonable jury could find that Mr.

14   Veloz was retaliated against based on race.  The retaliation claims are **DISMISSED**.

15              **C.      Race Discrimination Under Title VII, Section 1981, and FEHA.**

16   Mr. Veloz's race discrimination claims against PG&E are also **DISMISSED**.  Mr. Veloz has

17   failed to establish a prima facie case of race discrimination because there is no admissible

18   evidence that he was performing his job duties adequately or that he was treated differently than

19   similarly-situated non-Hispanics.

20   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), established the four

21   elements of a prima facie case of race discrimination:  (1) plaintiff belongs to a protected class,

22   (2) he was performing his job duties adequately, (3) he was subject to adverse employment

23   action, and (4) he was treated differently than similarly-situated employees who do not belong to

24   the protected class.  It is uncontested that Mr. Veloz is Hispanic, was disciplined, and was

25   terminated.  The questions that remain are whether Mr. Veloz was performing his job duties

26   adequately and whether he was treated differently than those similarly situated.  The answer to

27   both questions is no.  Mr. Veloz has not established a prima facie case of race discrimination.

28

20

There is no admissible evidence that Mr. Veloz was performing his job duties as a utility lineman adequately. *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 674 (9th Cir. 1988). In April 2011, he was reminded in the second decision-making leave letter that "the duties and responsibilities of your job require that you report to work on time and attend work regularly according to your scheduled hours of work." Nevertheless, Mr. Veloz continued a chronic pattern of absenteeism. Exhibit D to the Bradley declaration shows in calendar-format Mr. Veloz's absences for 2011 and 2012. There are absences for sick-leave, sick-relative leave, funeral, and/or vacations virtually every month. Around holidays like July 4, Martin Luther King, Jr. Day, and Valentine's Day, without fail, he took time off without permission, without calling in, and/or without providing adequate documentation. PG&E went to great lengths to warn plaintiff to fix his absenteeism problem. He was given oral warnings, written reminders, and decision-making leave. Nevertheless, the absenteeism continued. No reasonable jury could find his unavailability and unreliability satisfactory work performance for a PG&E utility lineman, installing and maintaining our country's utility lines (Kirk Decl. Exh. B). (Recall also that Mr. Veloz was first terminated in 2006, after two alleged vehicle accidents and an electrical outage.)

Counsel for Mr. Veloz respond that:

> requiring Plaintiff to prove satisfactory job performance at this stage is concerning because it restricts that element to a narrow definition unsuited to the circumstances . . . . But one of Plaintiff's central contentions is that these same expectations were in fact not required to be met by his non-Hispanic coworkers.

(Opp. 16). In their view, so long as Mr. Veloz was "qualified," his burden has been met.

Even if this were the test, Mr. Veloz's qualifications are unestablished by admissible evidence during the relevant time period, 2008 to 2012. The only evidence Mr. Veloz cites is his "good work" performance reviews in 2001 and 2003 — more than ten years prior to his termination. Mr. Veloz cites pages bates-labeled DEF 000821, DEF 000823, DEF 000826, DEF 000831, and DEF 000833, appended to Attorney Dow Patten's declaration at Exhibit A (more about this exhibit below). Pages bates-labeled DEF 000823 and DEF 000826 are titled "EMPLOYEE PERFORMANCE RECORD," for "Rich Veloz." It appears to be a form in tabular format with handwritten comments. The comments include:

21

1    "Rich's work is Excellent" (Mar. 2003), "Rich used only 4 sick hours Jan – Feb — he is really

2    making a good effort to be here" (Mar. 2003), "Richard has used 27 hrs S/R and 22 hours sick,

3    encouraged him to watch his time, thanked him for all his hard work" (June 2003), "Rich has

4    been doing a great job in receiving [sic].  Although his #s were down a bit, but he has been

5    picking in grid [sic].  There has been a decrease in errors and he is always willing to help others

6    out (July 2003), "Richard continues to do a great job at managing his sick time . . . . Keep up the

7    good work Rich" (Aug. 2003), "Third time he has lied to me" (Dec. 2003), and "Counselled [sic]

8    due to 'blowing me off' when asked about trailer tires being removed.  Tell the truth when asked

9    in the future" (Mar. 2005) (Patten Decl. Exh. A at DEF 000823, DEF 000826).  (Recall, Mr.

10   Veloz was terminated in 2006 and reinstated per a settlement in 2008.)

11        Assuming *arguendo* that the forgoing comments are admissible, they do not support Mr.

12   Veloz leaping to the conclusion that he was an "exemplary" worker during the relevant time

13   period (Opp. 2–3).  Positive commentary given in 2001 and 2003 cannot support the conclusion

14   that he was performing his job adequately in 2011 and 2012 when he was disciplined and

15   terminated.

16                          *                    *                    *

17        This order must now take a detour to address Exhibit A to Attorney Dow Patten's

18   declaration in support of the opposition to PG&E's motion, Exhibit A to Attorney Dow Patten's

19   declaration in support of the opposition to the union's motion, and Exhibit A to Spencer Smith's

20   declaration in support of plaintiff's sur-reply (Dkt. Nos. 70-2, 73-1, 123-1).  In total, counsel for

21   Mr. Veloz have larded into the record more than 181 pages of discovery documents.  The

22   documents are unorganized, unauthenticated, and lack proper foundation as submitted.  Attorney

23   Patten's declaration simply stated:  "Attached hereto as Exhibit 'A' are true and correct copies of

24   documents produced by Defendants IBEW and PG&E in this action" (Patten Decl. ¶ 2).

25        PG&E and the union object to this mishmash of unauthenticated documents (Dkt. Nos. 79

26   at 15, 81 at 2–4, *see also* Dkt. Nos. 71 at 4–5, 74 at 17).  The union argues that counsel are not

27   competent to authenticate PG&E's discovery documents.  Even if they were, PG&E and the union

28   call out a number of conclusory, unsubstantiated, and false statements made in Mr. Veloz's briefs.

United States District Court
For the Northern District of California

1   The union argues that counsel for Mr. Veloz "flouts not only the rudimentary requirement of any
2   competent filing, but specifically Local Rule 7-5(a)," which requires supporting affidavits or
3   declarations.  No weight can be placed on unsubstantiated attorney arguments lacking evidentiary
4   support.

5          Judge Frank Easterbrook (of the Seventh Circuit) has stated:  "judges need not paw over
6   the files without assistance from the parties."  *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084,
7   1085 (7th Cir. 1999).  Our court of appeals has stated:  "We have repeatedly held that
8   unauthenticated documents cannot be considered in a motion for summary judgment."  *Orr v.*
9   *Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  "The district court need not
10  examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not
11  set forth in the opposing papers with adequate references so that it could conveniently be found."
12  It is not the task of the district court or court of appeals to scour reams of paper in substitution for
13  the attorney opposing summary judgment.  *Carmen v. San Francisco Unified Sch. Dist.*,
14  237 F.3d 1026, 1031 (9th Cir. 2001).

15         Nevertheless, the undersigned judge has reviewed the documents cited in the briefs and
16  appended as Exhibit A.  Even considering these documents, Mr. Veloz's claims fail.  Mr. Veloz's
17  failure to proffer admissible evidence that he performed his job duties adequately, an element of
18  his prima facie case, renders him unable to proceed on the race discrimination claims.  But there
19  is more.

20         The second independent reason for dismissing the race discrimination claims is that no
21  reasonable jury could conclude that Mr. Veloz has established that similarly situated non-
22  Hispanic employees were treated differently.  Indeed, "Plaintiff had more than twice the number
23  of absences of any other lineman in his work group, and no other lineman had multiple [written
24  reminders] or a [decision-making leave] related to attendance" (Bradley Decl. ¶ 11).

25
26
27
28

United States District Court
For the Northern District of California

In response, Mr. Veloz chiefly relies on a:

> *listing of comparators* in Plaintiff's area who had the same or more absences as Plaintiff in the last four months of Plaintiff's employment, including 7 Caucasians, 3 Asians, 3 Hispanics, and 1 Native American.  Defendant has provided no further information on these comparators; however, *it is clear none were disciplined or terminated as was Plaintiff.*

(Opp. 18) (emphasis added).  The list is not appended to the opposition, which Mr. Veloz admits. It does not suffice to blame PG&E for designating a document as confidential and simply state "Plaintiff is prepared to submit the information under seal" (Opp. 18, n.6).  He should have filed it with a sealing motion.  *See* Local Rule 79-5.  PG&E argues that Mr. Veloz's failure to append the list or any information about these alleged "comparators" renders its impossible to determine whether they were actually similarly situated (Reply 3).  PG&E further argues that there were twenty lineman at plaintiff's service center, so the small sample size would have little predictive value.  *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1076 (9th Cir. 1986) (28 employees too small a pool).  Moreover, there is no evidentiary support for the proposition that the other non-Hispanic "comparators" were not disciplined.  The absence of evidence showing discipline does not prove they were not disciplined.

Next, Mr. Veloz calls out "Employee 22," who is allegedly Caucasian with allegedly comparable absence records.  In a footnote, Mr. Veloz argues:

> Plaintiff had only 14 sick relative days over the three year period; whereas Employee 22 had 51 over the same time period.  Plaintiff had a total of 113 days of absence in three years and Employee 22 had 109.5 days of absence.  *Id*.  Employee 22 received no discipline for this.

(Opp. 18, n.7) (citing Patten Decl. Exh. A at DEF 003436–59).  As stated above, the mishmash larded into Exhibit A has not been authenticated or explained.  The pages bates-labeled DEF 003436 to DEF 003459 can be found at docket number 73-3 at 19 to 42.  The pages are barely legible.  The pages show a table, titled "DAILY TIME OFF REPORT — Time Off for Month."  The Court has tried to use the zooming-function on the page, but the quality of the printing is poor.  It is virtually impossible to verify counsel's statements.  But it is certain that these pages *cannot prove* "Defendant did not discipline or terminate Employee No. 22" or "Employee 22 received no discipline" (Opp. 18 at 15–16, n.7).  No information about discipline

24

United States District Court

For the Northern District of California

1    or lack thereof is found at the unauthenticated pages bates-labeled DEF 003436 to DEF 003459.

2    We cannot even verify that Employee 22 is non-Hispanic or similarly situated.

3           The last argument of counsel is that non-Hispanic coworkers received different treatment.

4    According to counsel:  Sean Ferguson (Caucasian) did not appear for the emergency mandatory

5    overtime, a non-Hispanic coworker took funeral leave, and non-Hispanics took days off without

6    giving notice — all allegedly without discipline.  Once again, the proof unravels.   The deposition

7    testimony cited by Mr. Veloz fails to support these assertions.  The record is devoid of any

8    evidence that these individuals received no discipline or were similarly situated.

9           Even if we must turn to isolated examples of absenteeism, when the joint union-employer

10   fact-finding committee upheld Mr. Veloz's termination in 2012, it relied, in part, on two prior

11   decisions terminating employees for attendance issues (albeit from 1989 and 1987) (Bradley

12   Decl. ¶ 13, Exh. F).  In Mr. Veloz's case, the fact-finding committee found that "the Grievant's

13   attendance failed to meet expectations" and the termination was "for just cause" (*id.* Exh. G).

14          No reasonable jury could find that Mr. Veloz has established a prima facie case of racial

15   discrimination.  This deficiency is compounded by the legitimate reasons PG&E has marshaled to

16   dispel the presumption.  Mr. Veloz actually concedes this — "Plaintiff does not dispute that

17   Defendant has a legitimate business reason in regulating its employees attendance [sic]"

18   (Opp. 18).  As stated above, there is also no evidence that PG&E's reasons for disciplining and

19   terminating Mr. Veloz were a pretext for unlawful racial discrimination.

20          Accordingly, the race discrimination claims are **DISMISSED**.

21                      **D.     Wrongful Termination.**

22          Mr. Veloz's wrongful termination claim is also **DISMISSED**.  As stated above, Mr. Veloz

23   has conceded that PG&E has shown legitimate reasons for terminating him based on his excessive

24   absences and unavailability.  In opposition, Mr. Veloz raises the new argument that PG&E

25   wrongfully terminated him in retaliation for requesting leave under the Family Medical Leave Act

26   (FMLA) and California Family Rights Act (CFRA).  In sur-reply, Mr. Veloz argues that

27   paragraph 135 of the complaint gives fair notice of the new theory that PG&E retaliated against

28   him for requesting leave under the California Family Rights Act (Compl. ¶ 135, Sur-Reply 7):

United States District Court

For the Northern District of California

> 135.  Plaintiff's wrongful termination from his employment with
> PG&E was based upon Defendant's violation of public policy,
> including but not limited to the following: the fundamental public
> policies against discrimination, harassment and retaliation as
> expressed in the Civil Rights Act of 1964 and the California Fair
> Employment and Housing Act and subsequent amendments thereto.

Not so.  The FMLA and CFRA are noticeably absent from this paragraph and the complaint.  Even Mr. Veloz concedes this:  "the Complaint does not specifically allege that Plaintiff was denied FMLA/CFRA leave or that Plaintiff was discouraged from taking FMLA/CFRA leave" (Sur-Reply 7).  This tardy theory was never raised in the complaint and it is now too late.  Accordingly, the wrongful termination claim is **DISMISSED**.

### E.    Punitive Damages.

PG&E seeks to dismiss Mr. Veloz's request for punitive damages because there is no clear-and-convincing evidence that an officer, director, or managing agent committed acts of malice, oppression, or fraud.  Mr. Veloz responds only in a footnote, arguing that "Defendant's failure to identify the persons who were involved in investigating Plaintiff (Interrogatory No. 2) precludes Plaintiff from identifying whether Stacy Campos" is a managing agent and thus "summary judgment is inappropriate on Plaintiff's punitive damages claim" (Opp. 22, n.9).  PG&E's response to interrogatory number 2 is not appended to the opposition.  On reply, PG&E appends the responses and argues that any discovery deficiencies that exist should have been raised earlier.  In any event, no reasonable jury could find punitive damages here.  The claim for punitive damages is **DISMISSED**.

*                    *                    *

In sum, all claims against defendant PG&E are **DISMISSED**.

### 3.    MR. VELOZ'S MOTION FOR SUMMARY JUDGMENT AGAINST PG&E.

Mr. Veloz moves to dismiss a number of PG&E's affirmative defenses.  In opposition, PG&E withdrew its "First, Second, Fourth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, Nineteenth, Twenty-First, Twenty-Second, and Twenty-Fourth affirmative defenses" (Opp. 1).  PG&E argues that Mr. Veloz has failed to put forth "any competent evidence, much less substantial evidence, eliminating a possibility that a jury could find in favor of PG&E" on the remaining affirmative defenses:  failure to exhaust administrative remedies,

avoidable consequences, failure to mitigate damages, and unclean hands.  Mr. Veloz did not file a reply brief.  This order need not reach Mr. Veloz's motion for summary judgment because all claims against PG&E have been dismissed.  Mr. Veloz's motion is **DENIED AS MOOT**.  This order also notes that Mr. Veloz failed to file a notice of the motion in violation of Local Rule 7-2 and 56-1 (Opp. 22).

### 4.   IBEW LOCAL 1245'S MOTION FOR SUMMARY JUDGMENT.

The complaint alleges two claims against the union:  race discrimination and duty of fair representation.  Both claims are **DISMISSED**.

#### A.   Race Discrimination.

The complaint alleged that Mr. Veloz "was treated less favorably than his non-Mexican-American counterparts, based upon his race . . . including, but not limited to . . . resolution of grievances" (Compl. ¶ 72).  Under oath, however, Mr. Veloz testified that no one at the union ever called him any racially-derogatory names, ever used any racial or derogatory language, or ever used any racially-offensive depictions, videos, or jokes.  He also testified (Veloz Dep. at 92, 99):

> Q.  Okay.  Do you have any reason to believe that anybody at the union who was involved in your grievance has a bias against people because they're Mexican-American.
>
> A.  No.

The union representative stated:  "I also never inquired as to Plaintiff's race or ethnicity, and these details were never revealed to me by anyone at Local 1245.  Neither factor entered into my decision regarding Plaintiff's case whatsoever" (Ball Decl. ¶ 9).

In opposition, Mr. Veloz did not contest dismissal of the race discrimination claim.  Indeed, he outright conceded that only the breach of the duty of fair representation claim remains against the union (Opp. 1, 9).  In the parties' joint final pretrial statement, plaintiff did not identify race discrimination against the union as a claim (Dkt. No. 104).  In response to the union's second motion *in limine*, Mr. Veloz stated:  "Plaintiff is not pursuing a claim against the union for discrimination," in a section titled "No Discrimination Claims Against IBEW Remain" (Dkt. No. 98-2).  Accordingly, the race discrimination claim against the union is **DISMISSED**.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

### B.    Duty of Fair Representation.

Our court of appeals analyzes an alleged breach of the duty of fair representation on a continuum — from ministerial acts to acts of judgment.  *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 880 (9th Cir. 2007).  The analysis is:

> if the conduct was procedural or ministerial, then the plaintiff may prevail if the union's conduct was arbitrary, discriminatory, or in bad faith.  However, if the conduct involved the union's judgment, then the plaintiff may prevail only if the union's conduct was discriminatory or in bad faith.

*Wellman v. Writers Guild of America, West, Inc.*, 146 F.3d 666, 670 (9th Cir. 1998) (citations omitted).

Mr. Veloz's duty of fair representation claim is based on (1) the failure to file a grievance for Mr. Veloz's April 2011 decision-making leave and (2) the failure to arbitrate Mr. Veloz's termination (Opp. 13).  The union never filed a grievance for the April 2011 decision-making leave, although Mr. Veloz had two other pending grievances at the time (Brill Dep. at 10–11).  The union grieved Mr. Veloz's termination, but that termination was upheld at the fact-finding stage.  It never proceeded to arbitration.  Mr. Veloz argues that the union's conduct was ministerial, arbitrary, and in bad faith.  This order disagrees.

### (1)    April 2012 Termination.

Mr. Veloz argues that the union's decision not to arbitrate the April 2012 termination after the fact-finding decision was ministerial (Opp. 13).  His reliance on *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1272–73 (9th Cir. 1983), is misplaced.  There, the union's conduct was arbitrary because it filed the request for arbitration two weeks late, without explanation, rendering the grievance untimely.  The court distinguished "[k]eeping track of deadlines" (ministerial) from a "decision about how to handle the grievance" (judgment).  The court noted: "[b]ecause the union must balance many collective and individual interests when it decides whether and to what extent to pursue a particular grievance, courts should accord substantial deference to the union's decisions."  Two years later, in *Eichelberger v. N.L.R.B.*, 765 F.2d 851, 855 (9th Cir. 1985), the court narrowed the scope of *Dutrisac* so that "the seeming aberrance of *Dutrisac* appears less inconsistent with previous case law."

28

1    The decision not to arbitrate Mr. Veloz's April 2012 termination was an act of judgment.

2  "A union's decision not to arbitrate a grievance that it considers to be meritless is an exercise of

3  its judgment.  And, in general, a union's decision about how best to handle a grievance also is a

4  matter of its judgment."  *Wellman*, 146 F.3d at 671.  Here, the timeline is as follows.

5    A letter, dated April 4, 2012, informed Mr. Veloz of his termination.  Shortly thereafter,

6  the union filed Grievance Form No. 21536, which stated in relevant part (Dkt. No. 54-3 at 9):

7        GRIEVANCE ISSUE:  ON OR ABOUT 4-4-12, THE GRIEVANT
          WAS TERMINATED FOR ALLEGED CONTINUED
8        UNAVAILABILITY, INCLUDING UNAUTHORIZED
          ABSENCE.

9
          CORRECTION ASKED FOR:  MAKE GRIEVANT WHOLE.
10
          Submitted by: BILL BRILL   Under Section: 102 on 4-6-12
11
          COMPANY ANSWER:  The Grievant was terminated due to his
12        continued unavailability which included an unauthorized absence,
          while on a Decision Making Leave (DML) and multiple Coaching
13        & Counselings [sic].  Based on the foregoing, the Company
          maintains that the termination was for just cause and the correction
14        requested is respectfully denied.

15        FOR COMPANY:  Yvonne Bradley on 4/14/2012

16    In May 2012, the local investigating committee — consisting of Yvonne Bradley (human

17  resources) and Lee Kirk (supervisor) for PG&E, and Bill Brill (union representative) and Grant

18  Estrada (shop steward) for the union — met to discuss the grievance.

19    In July 2012, after the committee was unable to reach an agreement, they referred the

20  matter to the next level, fact-finding.  The committee report identified sixteen paragraphs under

21  "committee findings," detailing the witness testimony and documents presented.  The section

22  titled "union position" stated (Veloz Dep. Exh. 20):

23        The Grievant followed the Company's procedures when he was out
          sick for himself or his son.  Whenever his supervisor requested
24        verification of his absences, the Grievant provided a medical notice
          excusing him from work.  He had adequate sick leave available at
25        the time of discharge.  Additionally, the Grievant should not have
          been denied his request for a Floating Holiday, and subsequently
26        coded off work without permission without pay, since no other
          employee was scheduled on a Floater that day.  The Grievant
27        believes that he was being treated unfairly by his supervisor, even
          though he did everything that was asked of him by proving doctor's
28        notes and calling in when he was going to be absent.  Therefore, the
          discharge was without just cause.

29

According to Mr. Brill, "Plaintiff reviewed the [local investigative committee] report regarding his termination and emailed me corrections . . . . All of his corrections were adopted by PG&E in the final version of the [local investigative committee report]" (Brill Decl. ¶¶ 14–15, Exhs. E, F).

In August 2012, the fact-finding committee — consisting of Ken Ball and Bill Brill for the union, and Kathy Ledbetter and Yvonne Bradley for PG&E — rendered a memorandum of disposition regarding Mr. Veloz's termination.  The disposition stated (Bradley Decl. Exh. G) (emphasis added):

> While the Grievant provided evidence of illness as requested by the supervisor, the Grievant's attendance failed to meet expectations. After escalated levels of discipline including a Decision Making Leave and numerous opportunities to improve his attendance, the Grievant continued to excessively utilize his sick leave.  He also had a day off without permission.  Given the prior active discipline and the specifics of this case, *the Committee agreed that the termination was appropriate and for just cause.*

> The grievance is to be considered closed based on the above.

According to Ms. Bradley (PG&E), the fact-finding decision was "in part based on two prior cases upholding the terminations of employees who had progressed to the last step of the positive discipline process (a DML) for attendance issues, and continued to incur absences" (Bradley Decl. ¶ 13).  In both those decisions, the committee concluded the discharge was for just cause (Bradley Decl. Exh. F).

The union representative, Ken Ball, testified that PG&E probably gave Mr. Veloz more chances than most people would get and noted his prior experience with excessive-absenteeism arbitrations (Ball Dep. at 34–35, 50) (emphasis added):

> Q.  Why was a was a [sic] settlement reached rather than sending grievance number 21536 to pre-review committee?

> A.  Because it didn't merit going to pre-review committee, in my opinion.

> Q.  Why not?

> A.  Well, the grievant was on a [decision-making leave].  He had several coaching and counseling.  *He did not clean up his usage of sick leave.*  He failed to meet call-in procedure.  There is a number of things that he did in that case and that's the memorandum of disposition is the settlement in that case and that's why we settled it.

United States District Court

For the Northern District of California

*He went through the grievance procedure, he went through
the disciplinary procedure.  They gave him probably more chances
than most people would get.*

\*                      \*                      \*

Q.  Is there an occasion where it would be a violation of policy to
call in sick?

A.  There is an excessive absenteeism situation and it's pretty
common that we deal with.  *We have had an arbitrator rule that
when you are on a [decision-making leave], your position is
hanging by a thread.*  And in a very similar case to this, I recall, I
haven't seen it lately but there was a very similar case where
somebody was on a [decision-making leave] and using what was
determined to be an excessive amount of sick leave and that was
upheld by the arbitrator.

Mr. Ball (the union representative) also stated (Ball Decl. ¶ 10) (emphasis added):

In my thirty years of conducting Fact Finding, I have reviewed and
decided dozens of grievances that present the situation where an
employee of PG&E has been terminated due to attendance
issues . . . . *based on my experience and my understanding of
precedent, I concluded that Plaintiff's conduct was more than
sufficient to provide cause for his termination, and therefore, I
decided to close the case.*

Appended to his declaration are other decisions upholding terminations or discipline

(Ball Decl. Exhs. D–I).

Mr. Veloz received by mail a copy of the fact-finding decision for his termination

(Veloz Dep. at 313, Ball Decl. ¶ 11).  Mr. Veloz testified (Veloz Dep. at 313–14):

Q.  Did you call anyone after you got that?

A.  No, I didn't.

\*                      \*                      \*

Q.  Okay.  Did anyone ever tell you that you had a strong grievance
regarding your termination?

A.  No.

Mr. Veloz's grievance thus settled at the fact-finding stage.  (If, however, a grievance did

not settle at fact-finding, it went to a pre-review committee, then a full-review committee, then

arbitration.  At each stage in the process, "[i]f they can settle it, they settle it"

(Ball Dep. at 23–24).)

\*                      \*                      \*

1    This order finds that the union did not breach a duty of fair representation by exercising its

2    judgment not to arbitrate Mr. Veloz's termination.  No reasonable jury could find otherwise.  The

3    record does not support Mr. Veloz's bald allegations of arbitrary decision-making or bad faith.

4        Mr. Veloz relies on *Slevira v. Western Sugar Company*, 200 F.3d 1218, 1221

5    (9th Cir. 2000), to no avail.  In *Slevira*, our court of appeals found that the union deliberated the

6    grievant's alleged meritorious argument and offered a reason for not pursuing the grievance to

7    arbitration.  Summary judgment on the duty of fair representation claim was affirmed for the

8    union.  The court specifically noted "in accordance with the broad discretion traditionally owed to

9    unions, we do not scrutinize the quality of the union's decision."

10       Mr. Veloz also cites *Herman v. United Brotherhood of Carpenters & Joiners of America,*

11   *Local Union No. 971*, 60 F.3d 1375, 1380–82 (9th Cir. 1995), which is distinguishable.  There,

12   our court of appeals reversed summary judgment on the duty of fair representation claim because

13   the union had a "wholly unexplained failure to take any action with respect to [the grievant's]

14   claim following the Board of Adjustment's decision to submit it to arbitration."  The union "failed

15   to take action notwithstanding the continual prodding of [the grievant] and her attorney" and

16   "[n]othing in the record suggests that the union's failure to pursue the grievance resulted from a

17   belief that the grievance was unmeritorious."  The grievant was a "64-year-old disabled woman

18   who was abruptly fired after nearly 37 years of service" and her role was "filled by a 20-year-old

19   woman who appears to be underqualified."  Prior to the termination, her supervisor stated "he

20   planned to eliminate 'the old crippled lady.'"  The court, however, noted: "[w]e have long

21   afforded unions a reasonable range of discretion in determining how best to handle grievances,

22   and we will seldom find a breach of duty if a union evaluates and investigates a claim and

23   determines it to be without merit."  *Id*. at 1380.

24       Our situation is markedly different.  The union determined further review and arbitration

25   of the termination would be without merit.  Mr. Veloz had many chances to fix his chronic

26   absenteeism.  It was not fixed.  Accordingly, the duty of fair representation claim based on the

27   failure to arbitrate the termination in April 2012 is **DISMISSED**.

28

United States District Court

For the Northern District of California

32

*(2)     April 2011 Decision-Making Leave.*

The statute of limitations on a duty of fair representation claim against the union is six months from when plaintiff knew or should have known of the union's alleged wrongdoing (Opp. 15, Reply 2).  This order finds that Mr. Veloz's second proffered basis for his duty of fair representation claim — the union never grieved the earlier April 2011 decision-making leave — is time barred.  It is undisputed that Mr. Veloz was placed on decision-making leave on April 19, 2011, and this action was filed on December 12, 2012.

Under the collective-bargaining agreement, the union had "30 calendar days after the date the action complained of, or the date the employee became aware of the incident which is the basis of the grievance, whichever is later" to file a grievance (Brill Dep. Exh. 1 at DEF 002200, Section 102.3(a)(2)).  This means the union had until May 19, 2011 to file a grievance.  The complaint was filed in December 2012 — nineteen months later.

Mr. Veloz has two responses.  *First*, in his own summary-judgment motion, he argues that the union's affirmative defense under the statute of limitations should be "summarily adjudicated" because the "union grievance process on his termination was not completed until August 22, 2012" (Br. 3).  This is non-responsive to the union's timeliness challenge for the April 2011 decision-making leave.

*Second*, in opposition to the union's motion, Mr. Veloz concedes his claim for the April 2011 decision-making leave is untimely.  Instead, he argues that he is entitled to equitable tolling.  He argues:  "Defendant never informed Plaintiff that it had not grieved the DML."  In Mr. Veloz's view, this was a "misrepresentation . . . 'lulling' Plaintiff" into believing his claim was tolled (Opp. 15).  Not so.

Mr. Veloz testified that when he appeared for the local investigating committee meeting on May 24, 2011, regarding his two then-pending grievances (for the written reminders), he asked the union representative about grieving his April 2011 decision-making leave (Veloz Dep. at 193–94) (emphasis added):

Q. So give me your best words, your specific words that you used.

A. I would like to grieve the DML that I'm on.

33

United States District Court

For the Northern District of California

1    Q.  Okay.  And then what happened after that?

2    A.  And then supposedly he filed the grievance.

3    Q.  Okay.  And then —

4    *A.  And when I went to the [local investigating committee] to do*
     *these other grievances, I had told Shea and Bill, what's going on*
5    *with the [decision-making leave] grievance?  And they had told me*
     *that they're not going to talk about it at that time.*

6
     Q.  Okay.
7
     A.  So in essence, I don't know if it was filed or not.
8
     Q.  Oh.  So what did you do?
9
     A.  Well, there's nothing else I could have done at that time.
10
     Q.  Okay.  So let me see if I've got it right.  You see these final
11   determinations are made in September; right? . . . .

12   A.  I see that.

13   Q.  So did you ever write anybody and say, hey, what's up with the
     [decision-making leave]?
14
     A.  No.  I felt that contacting my union rep and my shop steward,
15   that that would be sufficient enough.

16   The union representative, however, stated:  "Following the [local investigative committee]

17   meeting for the written reminder grievances, *Plaintiff never once asked me about the existence or*

18   *status of a grievance to contest the DML*" (Brill Decl. ¶ 11) (emphasis added).

19          But even if we accept Mr. Veloz's testimony at face-value, he should have known by

20   April 2012 (one *year* later), exercising reasonable diligence, that the union had not grieved his

21   decision-making leave.  His termination letter, dated April 4, 2012, calls out the decision-making

22   leave (Kirk Decl. Exh. E) (emphasis added):

23          Your termination of employment is due to your continued
            unavailability, including your unauthorized absence.  Additionally,
24          *after escalated levels of disciplinary action including the Decision*
            *Making Leave (DML)* and the subsequent Coaching and
25          Counseling, your attendance continued to be unsatisfactory.

26   His supervisor, Lee Kirk, provided him with a copy of the termination letter (Kirk Decl. ¶ 13).

27   Mr. Veloz waited (more than six months later) until December 12, 2012 to file his claim.

28

34

No reasonable jury could find that Mr. Veloz was unaware that the April 2011 decision-making leave was ungrieved.  Indeed, Mr. Veloz testified about his distrust of the union (Veloz Dep. at 297, 314):

> Q.  Okay.  Did you — okay.
>
> A.  Honestly, I didn't trust the union, being the last time I had — this go-around with PG&E and the union, which is the reason why I'm suing the union also, is because of misrepresentation.
>
>         *           *           *
>
> Q.  Okay.  Did anyone at the union give you, prior to your termination, reason to distrust them?
>
> A.  Yes.
>
>         *           *           *
>
> Q.  When?
>
> A.  Didn't answer my question when — times that I was asking him.  I had called him on something regarding the floating holiday during my termination, and he stated something along the lines that that has nothing to do with my case.  And I called him on it, and that reassured me that he was basically flopping to the other side and him and the company were — were together.

Equitable tolling and equitable estoppel do not save the day.  There is no evidence of fraudulent concealment of the failure to grieve or deception by the union.  It is simply not enough for Mr. Veloz to sit on his hands blaming the union that they never "informed him" they had not grieved his April 2011 decision-making leave.

In sum, all claims against the union are **DISMISSED**.

**5.    MR. VELOZ'S MOTION FOR SUMMARY JUDGMENT AGAINST THE UNION.**

Mr. Veloz moves for summary judgment on a number of the union's affirmative defenses.  In opposition, the union withdraws all of its affirmative defenses, except for the statute of limitations and unclean hands defenses (Opp. 2).  As noted above, the union objects to the evidentiary flaws with Mr. Veloz's motion and observes Mr. Veloz's failure to notice the motion (Opp. 4–5).  All claims against the union have been dismissed.  Mr. Veloz's motion for summary judgment against the union's affirmative defenses is **DENIED AS MOOT**.  Finally, this order notes that Mr. Veloz never filed reply briefs in support of his summary judgment motions.

1    That deadline has passed.

2                              **CONCLUSION**

3         For the reasons stated herein, all claims against PG&E are **DISMISSED WITH PREJUDICE**.

4    All claims against IBEW Local 1245 are **DISMISSED WITH PREJUDICE**.  No claims remain for

5    trial.  Judgment will be entered.  The Court asks that counsel please be accurate in explaining to

6    the court of appeals what was and was not properly shown to be admissible and part of the

7    summary-judgment record.

8

9         **IT IS SO ORDERED.**

10

11   Dated:   May 8, 2014.

12                                              WILLIAM ALSUP
                                                UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California