IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD VELOZ,<br><br>    Plaintiff,<br><br>  v.<br><br>PACIFIC GAS & ELECTRIC COMPANY and<br>IBEW LOCAL 1245,<br><br>    Defendants.<br>                                                            / | No. C 12-06309 WHA<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND EXPENSES** |

**INTRODUCTION**

In this race-discrimination employment action, the employer moves for attorney's fees and expenses following summary judgment in its favor. For the reasons stated herein, the motion is **DENIED**. A copy of this order, however, will be referred to the Office of the United States Attorney.

**STATEMENT**

Plaintiff Richard Veloz identifies himself as Mexican-American or Hispanic. He was fired by his employer, defendant Pacific Gas & Electric Company ("PG&E"), for excessive absenteeism. The termination was found to be "appropriate and for just cause" by the fact-finding committee composed of the union, defendant International Brotherhood of Electrical Workers ("IBEW") Local 1245, and PG&E.

Plaintiff's counsel are Attorneys Spencer Smith and Dow Patten from Smith Patten, located in San Francisco. In December 2012, Attorneys Smith and Patten filed a complaint

alleging: race discrimination and retaliation in violation of Title VII; race discrimination in violation of Section 1981 of Title 42 of the United States Code; duty of fair representation; race discrimination under the California Fair Employment and Housing Act ("FEHA"), California Government Code 12900, *et seq.*; retaliation under FEHA; harassment under FEHA; and wrongful termination. The complaint did not reference any claim based on the Family Medical Leave Act ("FMLA") or the California Family Rights Act ("CFRA").

From December 2012 to March 2014, no motions to dismiss, dispositive motions, or FRCP 11 motions were filed. In April 2014, the union, PG&E, and Mr. Veloz each moved for summary judgment. A May 2014 order granted summary judgment for defendants, dismissing all claims (Dkt. Nos. 129, 130). This order follows full briefing and oral argument.

## ANALYSIS

Defendant PG&E seeks fees and expenses pursuant to FRCP 54(d), under Section 1927, FRCP 11, Title VII, Section 1988, and FEHA in the amount $535,976; or alternatively, in the amount $439,844 for fees and expenses incurred after April 2013 (when plaintiff was first deposed). PG&E seeks to hold plaintiff Richard Veloz and his counsel, Attorneys Spencer Smith and Dow Patten, jointly and severally liable for fees and expenses (Br. 1, 21). This order will briefly canvass the relevant authorities.

The American Rule is that each party bears his own litigation expenses, including attorney's fees, regardless of whether he wins or loses. *Fox v. Vice*, — U.S. —, 131 S. Ct. 2205, 2213 (2011). Congress, however, has created certain fee-shifting statutes.

Title VII, Section 1988, and FEHA permit, but do not mandate, fee shifting. Title VII, 42 U.S.C. 2000e-5(k), states that: "[i]n any action or proceeding under this subchapter, the *court, in its discretion, may* allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs" (emphasis added). Section 1988 of Title 42 of the United States code states that: "[i]n any action or proceeding to enforce a provision of *sections 1981*, 1981a, 1982, 1983, 1985, and 1986 of this title . . . *the court, in its discretion, may* allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the cost" (emphasis added). Section 12965(b) of the California Government Code states that: "[i]n civil actions brought under

this section [Fair Employment and Housing Act], the *court, in its discretion, may* award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees" (emphasis added).

In civil rights actions, the Supreme Court has stated that:

> When a plaintiff succeeds in remedying a civil rights violation, we have stated, he serves as a private attorney general, vindicating a policy that Congress considered of the highest priority. He therefore should ordinarily recover an attorney's fee from the defendant — the party whose misconduct created the need for legal action. Fee shifting in such a case at once reimburses a plaintiff for what it cost him to vindicate civil rights, and holds to account a violator of federal law.

*Fox*, 131 S. Ct. at 2213 (internal citations and quotation marks omitted). Attorney's fees to prevailing defendants, however, are awarded "only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421 (1978). This is because, even when unsuccessful, civil rights suits:

> provide an important outlet for resolving grievances in an orderly manner and achieving non-violent resolutions of highly controversial, and often inflammatory, disputes . . . . Our system of awarding attorneys fees in civil rights cases is in large part dedicated 'to encouraging individuals injured by . . . discrimination to seek judicial relief.'

*Harris v. Maricopa County Superior Court*, 631 F.3d 963, 971 (9th Cir. 2011).

PG&E also seeks fees under Section 1927 of Title 28 of the United States Code, which states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Federal courts also have inherent powers to assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). "[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party."

*Id*. at 46 (internal quotation marks omitted).  While "[r]ecklessness suffices for [Section] 1927 sanctions . . . sanctions imposed under the district court's inherent authority require a bad faith finding."  *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).

In addition, under FRCP 11(c)(1):

> the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.  Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

**1.    PLAINTIFF'S LACK OF KNOWLEDGE OF DISCRIMINATORY ACTS.**

In employment discrimination cases, a common gimmick by the defense is to ask the plaintiff at a deposition whether the plaintiff heard racial epithets or other direct admissions of racial bias and when the plaintiff answers no, to assert that the plaintiff "conceded away" the case.  This is counterfeit logic.  Just because the plaintiff himself heard and saw no racially derogatory language hardly proves conclusively that discrimination was absent — discrimination can be proven from other witnesses or documents, such as the employer's own emails and memoranda.  Turning to the instant case, it is true that plaintiff stated he observed no epithets or other discriminatory acts, but contrary to PG&E, that alone hardly "conceded away" the case.  It was not, as PG&E argues, so obvious following Mr. Veloz's first deposition in April 2013, that his claims were "frivolous."

The complaint alleged racial harassment, retaliation, race discrimination, and wrongful termination against PG&E.  Even if plaintiff was destined to lose his harassment claim, his discrimination claim (and other claims) might have survived based on facts in discovery, which remained open for ten more months after the deposition.  Fact discovery closed in February 2014.  Although it is true that PG&E sent a letter requesting dismissal and citing FRCP 11 in April 2013, PG&E never filed a timely FRCP 11 motion with the Court, no doubt because Mr. Veloz's testimony in April 2013 did not foreclose the possibility that other evidence of race discrimination or wrongful termination could exist.  Now, of course, we know Mr. Veloz's claims

4

did not survive summary judgment but it would go too far to conclude that it was abundantly clear in April 2013 that Mr. Veloz had no case.

### 2. DISCOVERY CONDUCT.

PG&E cites a litany of discovery complaints. PG&E argues that fees should be awarded because plaintiff's counsel filed unsuccessful discovery letters, made long speaking objections during plaintiff's deposition, missed a meet and confer, repeatedly sought overbroad discovery, propounded interrogatories numbers 26 through 28 in violation of FRCP 33(a), failed to appear at a scheduled deposition, larded the record with unauthenticated exhibits, and attempted to bring untimely new claims on the eve of trial. Nevertheless, it is now too late to seek fees for past discovery disputes. PG&E should have timely moved for sanctions when those disputes were fresh. To wait until after all claims have been dismissed on summary judgment is too late.

### 3. STATEMENTS UNDER OATH.

PG&E's most serious contention is that plaintiff lied under oath in his deposition. The essence of the story is that plaintiff engaged in excessive absenteeism and then invented false emergencies to explain away missing work. Although some of PG&E's accusations are overblown, Mr. Veloz's testimony regarding his uncle's funeral, his friend at the hospital, his son's cardiologist appointment, his flat tire, and his DFEH pre-complaint questionnaire do raise eyebrows. Here are the details.

#### A. Uncle's Funeral.

In March 2011, Mr. Veloz took two days off for funeral leave. At his first deposition in April 2013, Mr. Veloz testified that he missed work to attend his uncle's funeral (Dkt. No. 66-1, Veloz Dep. 206–07) (emphasis added):

> Q. And it says here you took some funeral leave; right?
> A. Yes.

5

> Q. What was the nature of the documentation that you brought back showing that you were on the funeral leave?
>
> A. I brought a keepsake that was given out at the funeral.
>
> Q. What was the keepsake?
>
> A. It was a little small box with my uncle's name on it.
>
> *Q. Okay. Where was the funeral?*
>
> *A. It was in Arizona.*
>
> *Q. How did you get there?*
>
> *A. I drove there.*
>
>       \*      \*      \*
>
> Q. Okay. So you're telling me that if I subpoena the records from MasterCard at Wells Fargo with your name on it, there should be credit-card receipts showing that you paid for a trip to Arizona?
>
> A. If it's at — if that's — yeah.
>
> Q. That's a yes?
>
> A. Yes.
>
> *Q. Where did you stay in Arizona?*
>
> *A. In Phoenix.*
>
> *Q. Where?*
>
> *A. At a uncle — at my uncle's house.*

A year later, after Mr. Veloz was compelled to appear at a second deposition in March 2014, he testified differently (Dkt. No. 66-5, Veloz Dep. 375):

> Q. But he passed in Phoenix, Arizona. And what you — but you never went to the funeral, correct?
>
> A. I never went to the funeral only because I had to stay with my son. I couldn't afford to — to go.

In a verified interrogatory response, Mr. Veloz admitted: "Plaintiff did not attend a funeral on or about March 25, 2011 through March 29, 2011" (Dkt. No. 66-5, Davidson Exh. C).

  This is a serious discrepancy. Mr. Veloz has never explained why at first he testified that he went to Phoenix and later he testified that he never went.

6

### B.  Cardiologist Appointment.

In February 2011, a month before the "funeral leave," Supervisor Lee Kirk informed Mr. Veloz that a large storm was anticipated, necessitating an emergency, mandatory weekend assignment on February 26 and 27. When Mr. Kirk denied Mr. Veloz's request to be excused, Mr. Veloz wrote the following email to human resources, dated February 25, 2011 (Dkt. No. 66-2, Veloz Dep. Exh. 8) (emphasis added):

> The supervisor here, Lee Kirk, is forcing all hands to come in this weekend for the storm and I told him ahead of time I would not be able to come in due to my son being ill and having an irregular heart beat and *he has an appointment with a cardiologist on Saturday* and being a single father I have no one to take care of my son on the weekend. He insisted on me coming in and denied my vacation.

At his first deposition in April 2013, Mr. Veloz testified (Dkt. No. 66-1, Veloz Dep. 134–36, 188) (emphasis added):

> Q. Okay. "And he has an appointment with a cardiologist on Saturday."
>
> A. Mm-hmm.
>
> *Q. Did he?*
>
> *A. He did.*
>
> *Q. Who was the cardiologist?*
>
> *A. Dr. -- Mr. -- Dr. Roge.*
>
> Q. Dr. Roge. Did he go to an appointment with Dr. Roge that weekend?
>
> A. That weekend he didn't because he was sick.
>
>    *   *   *
>
> Q. When did you find out that your son was going to be too sick to go to the cardiologist?
>
> A. That Saturday.
>
> Q. That Saturday?
>
> A. Mm-hmm.

```
 1      Q.  What happened?

 2      A.  He was -- he wasn't feeling good.  He was ill.

 3      Q.  Okay.  And so what -- and so you didn't take him to the
        cardiologist?

 4      A.  No, I wasn't able to -- to make it that day with the cardiologist.

                        *               *               *

        Q.  Did you have any paperwork showing that you had an
        appointment on that Saturday?

        A.  No, I didn't.

        Q.  Are you aware that Kaiser's records don't show that you had an
        appointment on that Saturday?

        A.  I'm not sure -- I'm not sure.

                        *               *               *

        Q.  Did you really have an appointment on that Saturday?

        A.  Yes, I did.

        Q.  Do you have anything that shows it?

        A.  No, I don't.
```

In other words, he said that yes there really was an appointment with Dr. Roge but no he did not make it because on the day of the appointment, his son was too sick. At his second deposition in March 2014, Mr. Veloz had a weaker story (Dkt. No. 66-4, Veloz Dep. 345):

```
        Q.  That weekend did you take your son to any doctors?

        A.  I don't recall.

        Q.  Okay. That weekend did you have any appointments to see
        doctors with your -- with your son?

        A.  I don't recall. I don't recall. It's been so long.

                        *               *               *

        Q.  So your understanding as to why you wanted to take off that
        weekend was what?

        A.  Was to take care and monitor my son.
```

1   In February 2014, PG&E deposed two doctors. Dr. Claude Roge testified (Dkt. No. 139-6,
2   Roge Dep. 21, 22):

> Q. Before we get into those records [see below], did you ever schedule appointments on a Saturday or Sunday?
>
> A. Not a cardiology appointment, no.
>
> Q. So you wouldn't have set an appointment to see Elijah [Veloz's son] on a weekend?
>
> A. Not to see me.
>
> Q. Okay.
>
> A. I never saw regular appointments on weekends.
>
> Q. All right. So I'm going to move on to July 15, 2011, which looks to be the next time that you saw Elijah ---
>
> A. Okay.
>
>        *   *   *
>
> Q. So in your opinion, had there been any change in Elijah's condition on -- when you saw him on July 15, 2011?
>
> A. Not from the records here.
>
> Q. And what was your assessment of him on that date?
>
> A. So my assessment was that we have a stable condition.

PG&E submitted a six-page excerpt from Dr. Roge's deposition. Nowhere in that excerpt did Dr. Roge directly testify about the February 2011 weekend. Moreover, even though PG&E subpoenaed the hospital's records, PG&E never submitted any direct proof that there was no record of any cardiologist appointment made on the February 2011 weekend in question. And, although the lead question above advertised that questions would be asked about "those records," no such passage about records from February 2011 in the deposition was supplied in the record. All we have is a stray letter from Dr. Roge to Elijah Veloz, dated March 7, 2011, which stated (Dkt. No. 66-2, Veloz Dep. Exh. 10) (emphasis added):

> To Whom It May Concern:
>
> Elijah has been followed for a congenital heart defect (secundum atrial septal defect) and a cardiac arrhythmia (sinus bradycardia) in the pediatric cardiology clinic. *We are planning to see him again this summer (or sooner if symptomatic) with additional testing.* There is a small chance that Elijah will need further interventions in the future.

This letter, however, does not foreclose the possibility that Elijah Veloz could have needed an appointment earlier than the summer of 2011.

PG&E also deposed a second doctor, Dr. Linda Fory, who testified (Dkt. No. 139-6, Fory Dep. 17–18):

> Q. Okay. Did you ever schedule appointments on the weekends, Saturdays, or Sundays?
>
> A. I don't schedule appointments on weekends. We have a clinic that's open on the weekends here in pediatrics, and I do sometimes work in the pediatric clinic on the weekends. I can't tell you if I was working on the weekend without looking at the schedule on --- at that time.
>
> \* \* \*
>
> Q. Do you know if there's a record of visits to the pediatric clinic?
>
> A. There should be a record of every visit.
>
> Q. Would that have been something that would show up in your documents?
>
> A. Yes.
>
> Q. So if Elijah had an appointment to come into the pediatric clinic, that should be reflected in the ---
>
> A. It would be in the medical record.

Here too, Dr. Fory never testified that there was no appointment in February 2011. The record does not foreclose the possibility that something came up and Mr. Veloz had an appointment for his son on that weekend in February with the clinic.

Nevertheless, counsel for PG&E baldly leaped to the conclusion that no appointment was made and stated the following (Dkt. No. 139, Davidson Decl. ¶ 16) (emphasis added):

> Concerned about the truthfulness of Plaintiff's testimony about the legitimacy of his absences and the dates of medical appointments during the first session of his deposition, *we subpoenaed documents from his three health care providers* and noticed their depositions

10

> for February 26th and February 27th. Their testimony demonstrated that Plaintiff had made material misrepresentations, both to PG&E in 2011 and during the first session of his deposition, regarding his activities in February 2011. *They testified they had no appointments scheduled for his son the weekend Plaintiff was supposed to report for storm related, mandatory overtime assignment. They further testified there was no need for such an appointment given that they were not scheduled to see him for another 6 months.*

In other words, other than counsel's representations, PG&E has provided no direct evidence in the record that there was no cardiologist appointment scheduled for the weekend of February 26 and 27, 2011. At oral argument, counsel were asked about the clinic's records. Plaintiff's counsel stated that the clinic did not keep records of the scheduling of appointments. Therefore, while the Veloz story is certainly dubious, the record does not show it was perjury.

### C.  Friend and Hospital.

Not only did plaintiff miss the weekend work assignment on February 26 and 27, but he also failed to show up on that Monday, February 28, 2011. On the Monday, Supervisor Lee Kirk called Mr. Veloz. "About an hour later, Plaintiff called me back claiming he was in the emergency room with a friend" (Dkt. No. 63, Kirk Decl. ¶ 5). On this motion, PG&E provided no evidence of the identity of the friend. Out of the blue at the deposition (as far as this record reveals), PG&E asked Mr. Veloz about someone named "Chris" (Dkt. No. 71-2, Veloz Dep. 80–83):

> Q. You know any people named Chris that you took to the hospital?
>
> A. Yes, I do.
>
> Q. Who was that?
>
> A. It's my friend from elementary school.
>
> Q. What's his last name? Or her last name, because Chris could be a man or a woman; right?
>
> A. Yes.
>
> Q. What -- is this Chris a male or a female?
>
> A. It's a male.

11

1  Q. What's his last name?

2  A. Munoz.

3  Q. Chris Munoz. And where does he live?

4  A. San Jose.

5                    *           *           *

6  Q. Okay. And when did you take him to the hospital?

7  A. It was a while ago. I don't recollect the date.

8  Q. Do you remember what the purpose for -- what -- what the problem was?

9  A. I had to take him in because he wasn't feeling good.

10 Q. Do you know what the problem -- what -- what he was not feeling good about?

11 A. Just said his stomach was upset and ....

12 Q. Upset stomach. Which hospital did you take him to?

13 A. Santa Teresa.

14 Q. Santa Teresa. Okay. How long were you guys there?

15 A. An hour or so.

16 Q. Do you know what time it was you took him in?

17 A. No, I don't.

18 Q. Okay. Are there any other Chrises that you've taken to the hospital?

19 A. No, I -- no, not that I remember.

But this testimony never established that "Chris" was the "friend" Mr. Veloz supposedly took to the hospital that Monday in February 2011. There is a disconnect.

At his second deposition in March 2014, Mr. Veloz testified (Veloz Dep. 344–56) (emphasis added):

Q. Okay. Did you ever take Chris Munoz to the hospital?

A. I don't -- I don't recall. I'm not sure.

Q. Okay. Do you know where Chris Munoz lives at?

A. I don't know.

12

United States District Court
For the Northern District of California

> Q. When was the last time you met Chris Munoz? . . . .
>
> A. I don't recall the last time I came in contact with Chris.
>
> Q. Okay. Is he a close friend of yours?
>
> A. He was a friend back in elementary, but I've lost touch with him.
>
> Q. Have you seen him since elementary?
>
> A. I don't recall, no.

It is, of course, concerning that at first Mr. Veloz testified that he took "Chris Munoz" to the hospital on some unknown date and, a year later, he testified that he could not remember if he had seen Mr. Munoz since elementary school. Nevertheless, this discrepancy would only matter if "Chris" was the friend he supposedly took to the hospital on February 28, 2011, a point of fact left out of the motion record.

### D. Flat Tire.

In March 2012, Mr. Veloz was absent again and called the PG&E hotline. The call records created by the PG&E reporter included the following statement (Dkt. No. 66-3, Veloz Dep. Exh. 19) (emphasis added):

> *On March 16, 2012, Richard called Lee to tell Lee that he was unable to attend work because his vehicle had a flat tire.* Richard [Veloz] asked Lee if he could use a floating holiday to cover his absence. Lee denied Richard's request and told him that he need him [sic] to attend work.

When asked about the flat tire at the deposition in March 2014, Mr. Veloz testified (Veloz Dep. 410–12):

> Q. Did you in any way whatsoever in March of 2012 indicate that you could not come to work on any day because you have a car problem?
>
> A. I don't recall if I did or I didn't. Those dates are kind of blurry in my memory. It's been a long time.
>
> Q. You never said anything to the effect of you had a flat tire?
>
> A. I'm not sure whether I did or not. I don't recall.

\*            \*            \*

13

1   Q. So now what kind of car were you driving?

2   A. I don't believe I need to give that information.

3   Q. Okay. Where did you take this car with the flat?

4   A. I don't believe I could give you that information?

5   Q. Why not?

6   A. 'Cause I just don't think it's pertinent to the case.

                    *           *           *

7   Q. Okay. Fine. Did you have a flat tire that morning, sir?

8   A. It's been a long time since that day, I mean, I don't know if I did or not.

                    *           *           *

9   Q. Did you have a flat?

10  A. As I stated before, I do not recall whether I did or I did not. It's been a long time since that date.

Deponent Veloz was wrong in refusing to answer the question, but PG&E brought no motion to compel an answer. As for possible perjury, Mr. Veloz never directly testified that he was absent in March 2012 because of a flat tire. In the record, the flat tire only came up in the call records. This does not show that Mr. Veloz lied under oath in a deposition.

### E.     DFEH Pre-Complaint Questionnaire.

PG&E states that it "has now determined that Plaintiff's declaration is false and that he never submitted the DFEH Questionnaire to the EEOC" (Br. 15). In April 2013, Mr. Veloz produced 256 pages of discovery documents, including a DFEH pre-complaint questionnaire bearing bates numbers PL000019 and PL000020 (Patten Decl. ¶ 122). Unlike the EEOC questionnaire, the DFEH pre-complaint questionnaire bears no "Received" stamp. On the eve of trial, when PG&E argued that there was no notice in the complaint of any claim under the Family and Medical Leave Act ("FMLA") or California Family Rights Act ("CFRA"), Mr. Veloz responded that (Dkt. No. 90-5):

> the "Denial of Family Care" is checked, as the grounds for discrimination on Plaintiff's DFEH Questionnaire (Exhibit "A" attached hereto). Defendant's claim that it has not had notice of Plaintiff's claim should be disregarded by the Court.

14

In other words, in Mr. Veloz's view, because someone checked "Denial of Family Care" on an unauthenticated DFEH pre-complaint questionnaire, PG&E should have been put on notice that Mr. Veloz's claims were alleged under the FMLA and CFRA. Not so. The complaint never referenced the FMLA or CFRA and that is what carried the day on summary judgment.

The question here, however, is whether the DFEH pre-complaint questionnaire and/or Mr. Veloz's declaration has been shown to have been false. In May 2014, Mr. Veloz signed a declaration which stated (Dkt. No. 126, Veloz Decl. ¶¶ 5, 7):

> 5. In or about April 2012, I spoke with someone named Martin Olsen [sic] from the EEOC's downtown San Jose office about the process of filing a complaint with the EEOC. I was provided EEOC and DFEH Questionnaires and instructed to fill them out. At no time did anyone from the EEOC assist me with filling out the Questionnaires or advise me about my potential claims . . . .
>
> 7. In or around April 2012, I hand-delivered the EEOC and DFEH Questionnaires to the EEOC's San Jose office.

He never directly authenticated the DFEH pre-complaint questionnaire. Indeed, the DFEH pre-complaint questionnaire has never been appended to a declaration from plaintiff (Dkt. Nos. 117, 126). Instead, plaintiff's counsel simply appended the questionnaire to their papers without properly authenticating it. Plaintiff's counsel, however, have represented in their briefs that "[o]n April 12, 2012, Plaintiff submitted a Questionnaire to the EEOC . . . . Later that month[,] Plaintiff submitted a pre-complaint questionnaire to California's Department of Fair Employment and Housing" (Dkt. No. 121 at 6).

While Mr. Veloz stated under oath that he delivered the DFEH questionnaire to the EEOC, PG&E's counsel stated the DFEH questionnaire did not appear in the DFEH and EEOC's document productions. In May 2014, according to a hearsay declaration from PG&E's counsel, the "DFEH confirmed that it does not have a record of Plaintiff having submitted a DFEH Questionnaire" (Dkt. No. 122-1, Chun Decl. ¶¶ 2–4). On May 13, two members of the EEOC (Martin Olson and Dana Johnson) told PG&E counsel that they "could not have given Plaintiff a copy of the DFEH Questionnaire because the EEOC does not have any DFEH forms in its office." Moreover, "if Plaintiff had submitted a DFEH Questionnaire, the EEOC would have retained this document as part of its file" (Dkt. No. 140, Chun Decl. ¶¶ 17–18).

15

PG&E has proffered no direct testimony from the EEOC and/or DFEH regarding the DFEH questionnaire or the EEOC's intake procedures in 2012, only hearsay. At oral argument, PG&E's counsel stated that appropriate persons from the EEOC would be willing to submit signed declarations and/or give oral testimony. But even so, it is hard to believe that Mr. Veloz would have had the foresight to forge the DFEH pre-complaint questionnaire before the April 2013 document production (when and where it was produced) to set the stage for its use a year later on the eve of trial to support an amendment motion. Holding an evidentiary hearing to examine EEOC personnel would not conclusively prove up perjury.

\*          \*          \*

At the end of the day, the record supplied by PG&E would only warrant an award of fees for investigating and proving the lies regarding the uncle's funeral. That aspect is strong. But this order will not grant any fees because PG&E has vastly overstated the case for bad faith and perjury, placing an undue burden on the parties and the Court to sort out the many gaps in the record. Moreover, PG&E's motion is massively overbroad, seeking $535,976 (or $439,844) for all work done in the case. The baby will go out with the bath water. Had PG&E asked for specific fees incurred for specific wrongs proven up, fees might have been awarded. But it did not.

\*          \*          \*

A danger in a motion like this is the appearance that the summary judgment order was wrongly based upon findings of alleged lies that normally would be for the jury to find, not the judge; questions of veracity being for the jury (except in the case of "sham" declarations and "sham" testimony). This order wishes to make clear that the summary judgment order was anchored in proper legal grounds for summary judgment and did not purport to resolve credibility issues. Indeed, the order stated (Dkt. No. 129):

> summary judgment is warranted because of a failure to present admissible evidence that he performed his job duties adequately during the relevant time period and/or that similarly-situated non-Hispanic employees were treated differently. Dismissal is warranted for these reasons, not for reasons of credibility.

**CONCLUSION**

For the reasons stated herein, PG&E's motion is **DENIED**. Because of the serious perjury questions raised, the Clerk shall send a copy of this order to our United States Attorney for her consideration and possible investigation, keeping in mind that while PG&E fell short in its record in certain aspects, those gaps might be closed via further investigation. The Court, of course, takes no position on whether the United States Attorney's Office should or should not further pursue this matter.

Finally, although no sanctions will be awarded against plaintiff's counsel, they must live up to the standards of practice in this district. Their sometimes obstructive conduct in this case and in past cases is a disappointment to the Court and if it continues, appropriate sanctions or referrals will result. Persistent zeal will not excuse persistent obstructions.

**IT IS SO ORDERED.**

Dated:   June 27, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE